IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

(1) EARNEST JOE FIELDS )
 )
    Plaintiff, )
 )
 ) Case No. CJ-2020-03167
vs. )
 ) Judge Caroline Wall
(1) CITY OF TULSA, OKLAHOMA, )
(2) OFFICER LUCAS TEMPLE, and )
(3) OFFICER J. JAMGOCHIAN, )
 )
Defendants. )

## ORIGINAL SUMMONS

**SERVE BY U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

    Lucas Temple
    5934 East 97th Street
    Tulsa, OK 74137-5010

To the above-named Defendant(s)

    You have been sued by the above named plaintiff(s), and you are directed to file a written answer to the attached petition and order in the court at the above address within twenty (20) days after service of this summons upon you exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff. Unless you answer the petition within the time stated judgment will be rendered against you with costs of the action.

    Issued this ___18___ day of ___nov___, 2020

County Court Clerk

By _____
Deputy Court Clerk

(Seal)

This summons and order was served on

_____
(Signature of person serving summons)

    YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THIS SUMMONS.
**Return ORIGINAL for filing.**

 

DISTRICT COURT
F I L E D
OCT 1 6 2020
DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

(1) EARNEST JOE FIELDS    )
                          )
   Plaintiff,             )  Case No. **CJ-2020-03167**
                          )
vs.                       )
                          )
(1) CITY OF TULSA, OKLAHOMA,   )  ATTORNEY LIEN CLAIMED
(2) OFFICER LUCAS TEMPLE, and  )  JURY TRIAL DEMANDED
(3) OFFICER J. JAMGOCHIAN,     )
                          )
   Defendants.            )

Caroline Wall

### PETITION

**COMES NOW** the Plaintiff, Earnest Joe Fields ("Plaintiff" or "Mr. Fields"), and for his Complaint against the Defendants, alleges and states, as follows:

#### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Earnest Joe Fields is a resident of Tulsa County, Oklahoma.

2. Defendant City of Tulsa ("City" or "Defendant City"), Oklahoma is a municipality located in Tulsa County, Oklahoma. The City provides and employs the Tulsa Police Department ("TPD").

3. The involved individual Defendants ("Officer Defendants"), including Officer Lucas Temple and Officer J. Jamgochian were at all times relevant hereto, police officers employed by the TPD. At all pertinent times, Officer Defendants were acting within the scope of their employment and under color of State law. Based upon information and belief, the Officer Defendants were residents of Tulsa County, Oklahoma at the time of the incidents described herein.

4. The acts giving rise to this lawsuit occurred in Tulsa County, State of Oklahoma.

5. This Court has jurisdiction and venue is proper in Tulsa County, Oklahoma.

## FACTUAL ALLEGATIONS

6. Paragraphs 1 through 5 are incorporated herein by reference.

**A. Facts Specific to Plaintiff**

7. On or about October 16, 2018 at just before 6:00 a.m., officers with the Tulsa Police Department ("TPD"), encountered Plaintiff Earnest Joe Fields at a QuikTrip store located at 4545 N. Lewis Avenue, Tulsa, OK 74110.

8. The Officer Defendants were called to the QuikTrip on suspicion of a non-violent domestic dispute between Plaintiff and his wife, who was in her car at a gas pump in the Quik Trip parking lot.

9. When the Officer Defendants arrived at the QuikTrip, Plaintiff was in the store making a cup of coffee.

10. The Officer Defendants made contact with Plaintiff inside the store as he was preparing his coffee before he purchased it at the counter.

11. The Officer Defendants asked Plaintiff to come outside and "tell his side of the incident."

12. Plaintiff told the Officer Defendants that he would comply with their orders and go outside, but he wanted to pay for his coffee first.

13. Plaintiff then walked to the counter and paid for his coffee.

14. Next, at the request of the Officer Defendants, Plaintiff slowly took off his jacket and placed his belongings on the counter of the QuikTrip.

15. Then, still following the Officer Defendants' commands, Plaintiff calmly walked outside.

2

16. Despite having followed all of the Officer Defendants' commands and staying composed, Plaintiff was then forcefully and unnecessarily tackled by the Officer Defendants as he stepped outside of the QuikTrip.

17. The Officer Defendants slammed Plaintiff to the ground, injuring his back.

18. At the time of this forceful takedown, Plaintiff was: (a) not suspected of committing any serious crime; (b) complying with the Officer Defendants' commands; (c) not posing any threat of physical harm to the Officer Defendants (or anyone else); (d) not attempting to flee; and (e) not resisting arrest.

19. The Officer Defendants then placed Plaintiff, who was not resisting in any way, in a headlock.

20. The Officer Defendants next placed Plaintiff in handcuffs and put him in their patrol car.

21. As a direct result of the Officer Defendants' use of violent, objectively unreasonable and excessive force on Plaintiff, Plaintiff suffered serious bodily injury, as well as mental pain and anguish.

22. Once Plaintiff was handcuffed and in the patrol car, he complained to the Officer Defendants that he had severe back pain due to them slamming him to the ground.

23. EMSA then responded to the scene, evaluated Plaintiff, and recommended that the Officer Defendants transport him to OSU Medical for further evaluation.

24. Dr. Baker-Hankton treated Plaintiff at OSU Medical. Dr. Baker Hankton ultimately cleared Plaintiff for booking at the Tulsa County Jail, but Plaintiff still had great difficulty walking after he was released from the hospital due to his back pain.

25. Plaintiff was charged with obstruction, but the charge was later dismissed with costs to the state, as that was found to be "in the best interest of justice."

### B. Facts Pertinent to the Existence of Municipal Policy or Custom

26. TPD has a pattern of using unnecessary and excessive force on civilians, especially those who are not suspected of serious crimes and are not fleeing or resisting.

27. For example, On February 5, 2017, TPD officers encountered Ira Lee Wilkins ("Mr. Wilkins") while he was sitting in his parked car at Jackie Cooper Imports of Tulsa, at 9393 South Memorial Drive in Tulsa, OK.

28. One of the officers on the scene, Officer E. Rangel, had activated his body camera, which captured the entire interaction between Mr. Wilkins and the TPD Officers.

29. Officer Will Mortenson ("Officer Mortenson") walked to Plaintiff's car and yelled at him to turn off the radio.

30. Mr. Wilkins complied with this order and remained seated in his car.

31. Officer Mortenson then ordered Mr. Wilkins out of his vehicle and, again, Mr. Wilkins complied.

32. Officer Mortenson then turned Mr. Wilkins around so his back was facing the officer and pushed Mr. Wilkins against his vehicle.

33. Next, Officer Mortenson pulled Mr. Wilkins's hands behind his back, handcuffed him, and began frisking him. Another Officer, Angela Emberton ("Officer Emberton") stood just inches away from Mr. Wilkins.

34. As Officer Mortenson was searching Mr. Wilkins, he asked Mr. Wilkins to identify himself. Mr. Wilkins slightly hesitated and Mortenson yanked back on the handcuffs and then forcefully pushed Mr. Wilkins up against his car.

4

35. Mr. Wilkins then asked why the officer was using so much force on Mr. Wilkins's wrists. Mortenson responded by threatening Mr. Wilkins with additional harm while the other officers on the scene can be heard laughing in the background. Emberton can be seen grabbing Mr. Wilkins's right arm at this point.

36. Mr. Wilkins again asked why Mortenson was exerting so much pressure on Mr. Wilkins's wrists, to which Mortenson responded that he needed to get into Mr. Wilkins's back pocket.

37. The two officers then began to yank on Mr. Wilkins's arms and Mortenson yelled at Mr. Wilkins to "quit." Mr. Wilkins then asked what he was supposed to be "quitting."

38. Approximately five seconds later, Officers Mortenson, Emberton, and Rangel forcefully took Mr. Wilkins to the ground.

39. Mr. Wilkins began pleading with the officers to stop and that they were breaking his wrists. A voice from one of the officer's radios then asked if the officers had "spray," and when the officer responded in the affirmative, an order was given to "spray him," despite the fact that Mr. Wilkins was compliant, not resisting, in handcuffs and subdued with three officers on top of him.

40. Mr. Wilkins continued pleading with the officers, who told him to "stop it." A "spraying" sound is then heard as Mr. Wilkins was doused with pepper spray.

41. Mr. Wilkins then began wailing in obvious distress as a result of being sprayed with pepper spray.

42. Officer Rangel then told the other two officers to turn Mr. Wilkins on his side and Mortenson continued searching Mr. Wilkins's pockets. Mr. Wilkins very slowly rocked back and forth on his side, in obvious pain, to which one officer responded by asking Mr. Wilkins if he

"would like more spray?" Mr. Wilkins said that he did not, and the officer taunted Mr. Wilkins by again asking, "do you want more spray?"

43. The officers then left Mr. Wilkins writhing on the ground in obvious pain and distress while they called EMSA.

44. Mr. Wilkins continued lying on the ground in complete silence, seemingly unconscious. He was so incapacitated that Mortenson asked Rangel if Mr. Wilkins was still breathing.

45. At this point Rangel told Mortenson that the officers "had to get [Mr. Wilkins] compliant one way or another, but he just kept fighting us," despite the fact that Mr. Wilkins had never resisted the officers' demands.

46. Mr. Wilkins was ultimately charged with: 1. Assault & Battery upon a Police Officer; 2. Actual Physical Control of a Vehicle while Intoxicated; 3. Resisting an Officer; and 4. Public Intoxication.

47. Similar to the situation with Mr. Fields, all of the charges against Mr. Wilkins, which were completely unwarranted, were later dismissed at the request of the State.

48. Mr. Fields and Mr. Wilkins are both Black men.

49. There is significant evidence that TPD has a practice and/or custom of "unnecessarily aggressive policing" against Black civilians.

50. In June 2020, TPD Major Travis Yates publicly stated that Tulsa police were "shooting African-Americans about 24 percent less than we probably ought to be, based on the crimes being committed."

51. Lt. Marcus Harper, President of the Black Officers Coalition, condemned Yates's comments and opined that there was a problem with TPD's "culture of policing...."

52.  Shortly thereafter, video surfaced of white Tulsa officers stopping and handcuffing two Black teenagers for jaywalking.

53.  In one video, an officer is seen forcing one of the boys to the ground and then pinning him down after he was handcuffed and subdued.

54.  As observed by Lt. Harper, this type of unnecessarily aggressive policing is "not happening in other parts of town."

55.  Lt. Harper's sentiments are supported by a 216-page report published on September 12, 2019 by John Raphling, senior US researcher at Human Rights Watch, entitled "'Get on the Ground!': Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma."

56.  Raphling's report "focuses on policing primarily as it impacts black communities in Tulsa, and especially poor black communities, that face policing in its most intensive forms."[1]

57.  Raphling found that "black people, even regardless of wealth or poverty, disproportionately receive aggressive treatment by police."[2]

58.  In analyzing data from 2012-2017 provided by TPD, Raphling found that "black people in Tulsa are 2.7 times more likely to be subjected to physical force by police officers than white people on a per capita basis."[3]

59.  Raphling further found that although black people only comprise 17 percent of Tulsa's population, they receive 39 percent of police uses of force. In contrast, "white Tulsans were 65 percent of the population but subject to only 55 percent of force incidents."[4]

---

[1] John Raphling, "Get on the Ground!": Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma, September 12, 2019, https://www.hrw.org/report/2019/09/12/get-ground-policing-poverty-and-racial-inequality-tulsa-oklahoma-case-study-us, last accessed on October 16, 2020.
[2] Id.
[3] Id.
[4] Id.

7

60. Raphling also found that "black arrestees were subject to force at nearly twice the rate of white arrestees when the violation that led to the force incident was a less serious 'public order' crime[5] or drug sale and at three times the rate for arrests on a warrant, a large portion of which were for missing court dates or payments on low-level violations."[6]

61. Concerningly, Raphling found that with extremely limited exception, use of force incidents committed by TPD Officers are determined to be compliant with TPD policy.

62. According to Raphling's analysis of the data provided by TPD, "of the 1700 incidents and 3364 distinct 'non-deadly' force actions reported by police from 2012 through 2017, the Tulsa Police Department found only two forceful acts that were not 'within policy.'" TPD imposed no discipline in those two cases. Further, Internal Affairs reports from 2012-2017 indicated that only five forceful acts were deemed to be noncompliant with TPD policy and only one of those resulted in discipline.[7]

63. The TPD Officers who used unnecessarily excessive force against both Mr. Fields and Mr. Wilkins were white.

## CAUSES OF ACTION

### CLAIM I
### EXCESSIVE USE OF FORCE
### (Fourth Amendment; 42 U.S.C. § 1983)
### (Defendants Temple and Jamgochian)

64. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 63, as though fully set forth herein.

---

[5] Such as the crimes of which Mr. Fields and Mr. Wilkins were accused.
[6] John Raphling, "Get on the Ground!": Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma, September 12, 2019, https://www.hrw.org/report/2019/09/12/get-ground-policing-poverty-and-racial-inequality-tulsa-oklahoma-case-study-us, last accessed on October 16, 2020.
[7] Id.

8

65. At the time of the complained of events, Plaintiff, as a free person, had a clearly established constitutional right under the Fourth Amendment to be secure in his person and free from unreasonable seizure through objectively unreasonable and excessive force to injure him and his bodily integrity.

66. In the totality of the circumstances, Plaintiff was cooperative, compliant, in no way actively resisting or attempting to evade TPD by flight, accused of only a non-violent misdemeanor, and in no way posing any immediate threat to the safety of TPD officers, himself or others.

67. Any reasonable police officer would, or should, have known of these rights at the time of the complained of conduct as they were clearly established at that time.

68. The actions of Officers Temple and Jamgochian, in throwing Plaintiff to the ground and placing him in a headlock were objectively unreasonable and excessive uses of force under the circumstances, and thereby violated the Fourth Amendment rights of Plaintiff.

69. The Officer Defendants' uses of force were also reckless, callous, and deliberately indifferent to Plaintiff's federally protected rights.

70. The Officer Defendants unlawfully seized Plaintiff by means of objectively unreasonable, excessive physical force, thereby unreasonably restraining Plaintiff of his freedom and causing him multiple serious bodily injuries, as well as mental pain and anguish, and the damages alleged herein.

71. As a proximate result of the Officer Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

**CLAIM II**

## Municipal Liability
### (City of Tulsa)

72. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 71, as though fully set forth herein.

73. There is an affirmative link between the deprivation of Plaintiff's constitutional rights and TPD policies, practices and/or customs which the City promulgated, created, implemented and/or possessed responsibility for.

74. Prior to the wrongful arrest of and excessive use of force on Plaintiff, there have been numerous other instances of constitutional deficiencies within the TPD that the City was aware of, but failed to alleviate.

75. In deliberate indifference to the harm likely to result, the City took either no remedial action, or inadequate remedial action, in response to the prior constitutional violations conducted by its officers.

76. Thus, the City has created and tolerated and maintained long-standing, unconstitutional department-wide customs, law enforcement related policies, procedures and practices, and failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference with respect to uses of force.

77. The deliberately indifferent training and supervision provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Plaintiff's civil rights and the resulting injuries alleged herein.

78. As a direct result of Defendants' unlawful conduct, Plaintiff has suffered serious actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

## CLAIM III

**Wrongful Arrest in Violation of the Fourth and/or Fourteenth Amendments
To the United States Constitution
(Pursuant to 42 U.S.C. § 1983)
(Defendants Temple and Jamgochian)**

79. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78, as though fully set forth herein.

80. In determining the existence of probable cause, Courts are required to include exculpatory evidence that was omitted or suppressed by law enforcement.

81. When one considers the evidence that was omitted, ignored or suppressed by Officers Temple and Jamgochian, there was plainly no probable cause for the arrest of Plaintiff.

82. As discussed in detail, *supra*, Mr. Fields was cooperative, fully complied with the Officer Defendants' orders and did not attempt to flee.

83. Yet, the Officer Defendants unnecessarily used excessive force on Plaintiff and subsequently arrested him for obstruction when they had no legal grounds upon which to do so.

84. This wrongful arrest lacked probable cause, as required by the Fourth Amendment, as applied to the States by the Fourteenth Amendment. This wrongful arrest violated Plaintiff's Fourth Amendment right to be secure against unreasonable seizure, and violated Plaintiff's Fourth Amendment-protected sense of security and individual dignity.

85. This wrongful arrest was a proximate cause of Plaintiff's imprisonment, delay in treatment for his physical injuries, emotional distress, pain and suffering, and the damages as alleged herein.

Respectfully submitted,

Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656

Bryon D. Helm, OBA #33003
Smolen & Roytman, PLLC
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

**Attorneys for Plaintiff**