**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **EARNEST JOE FIELDS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. 21-CV-0179-CVE-SH** |
| | ) |
| **CITY OF TULSA, OKLAHOMA,** | ) |
| **OFFICER LUCAS TEMPLE,** | ) |
| **OFFICER CHERISH COMFORT,** | ) |
| | ) |
| **Defendants.** | ) |

**OPINION AND ORDER**

Now before the Court are Defendant Officer Lucas Temple's Motion for Summary Judgment and Brief in Support (Dkt. # 55) and Defendant Officer Cherish Comfort's and City of Tulsa's Combined Motion for Summary Judgment and Brief in Support (Dkt. # 57).  This case arose out of incident that took place on October 16, 2018 in which plaintiff Earnest Joe Fields was arrested for obstructing an officer.  Defendant Cherish Comfort argues that he did not use excessive force against plaintiff when he was taken into custody, and Comfort and Lucas Temple assert that they had probable cause to arrest plaintiff for obstructing an officer.  Plaintiff responds that police officers violated his Fourth Amendment rights by detaining him without probable cause to believe that he had committed an offense, and Comfort using excessive force when he took an unresisting and compliant suspect to the ground.

**I.**

On October 16, 2018 at approximately 5:55 a.m., Tameko Warren called 911 to report that she was parked at a QuikTrip store located at 46th Street North and Lewis Avenue in Tulsa, Oklahoma, and she claimed that a man was letting the air out of her tires.  Dkt. # 55-1, at 00:10-

00:21 (recording of 911 call). Warren also stated that the man had blocked her vehicle into the parking space with his truck, and she identified the man as her "soon to be ex-husband," Fields. Id. at 00:21-00:26. Warren described Fields as a black man driving a white Chevy truck. Id. at 00:28-00:33. The 911 dispatcher asked if Fields had any weapons, and Warren claimed that Fields had a hammer that he was "hitting" on her window. Id. at 00:36-00:39. The dispatcher asked to Warren to describe Field's appearance, and Warren stated that Field was wearing a brown hat with the word Tulsa, a blue jacket, and a black shirt. Id. at 00:55-1:02. Warren did not know if Fields was still in possession of the hammer, and she told the dispatcher that it was probably in her tire. Id. at 1:12-1:18. Warren told the 911 dispatcher that she was alone in her vehicle and Fields had not hit her with the hammer. Id. at 1:30-1:36. Warren identified her car as a green Toyota Corolla and her car was still blocked in the parking lot by Fields' truck. Id. at 1:59-2:10 Upon further questioning, Warren stated that her vehicle was in a parking space, not at a gas pump, and Fields was continuing to let air out of her tires. Id. at 2:18-2:26. Warren clarified that she could see the hammer in Fields' hand and she did not want to get out of the vehicle. Id. at 2:30-2:43. Police officers were sent to Warren's location and she waited in her car until they arrived.

Tulsa Police Department (TPD) Officer Jill Sallee arrived on the scene and briefly entered the store before going to speak to Warren. Dkt. # 55-8, at 0:01-0:07 (Sallee bodycam video). Sallee walked over to Warren's vehicle, which was parked near an air pump at the side of the parking lot, and she asked Warren what happened to prompt her to call for help. Id. at 00:10-00:36. Warren stated that Fields pulled up in his truck in front of Warren's vehicle and began letting the air out of the tires of Warren's vehicle, but Warren had not exited her vehicle to inspect the tires since the encounter with Fields began. Id. at 00:37-00:45 Upon further questioning from Sallee, Warren

stated that Fields had not actually hit her and Fields "tapped on the window" with a hammer.  Id. at 1:05-1:15.  Warren acknowledged that she was scared by Fields conduct, even though she had not been injured, and Fields had been "violent" before this encounter.  Id. at 1:20-1:28.  Temple and Comfort arrived on the scene while Sallee was interviewing Warren, and Temple entered the store to locate Fields .

Temple entered the store and found Fields making a cup of coffee.[1]  Dkt. # 55-11, at 00:01-00:30.  Temple asked Fields to go outside the store to speak with police, but Fields indicated that he was going to pay for his coffee and get some gas for his truck.  Id. at 00:45-00:51.  At this point in the encounter, Fields paid for his coffee and gas and Temple went to speak to Sallee at Warren's vehicle, but Temple directed Comfort to make sure that Fields did not leave the store.  Id. at 1:45-2:03.  Temple spoke to Sallee and learned that Fields "tapped" on Warren's vehicle with a hammer, and Temple inspected Warren's vehicle for possible damage.  Id. at 3:00-3:32.  Temple returned to the store, and Fields was speaking in a raised voice to Comfort as Comfort directed Fields to remain in the store.  Id. at 4:01-4:15.  Comfort clearly told Fields to stay in the store and Fields again stated that he was going to put gas in his truck.  Id. at 4:17-4:25.  Temple advised Fields that the officers were trying to determine what happened during Fields' interaction with Warren at her vehicle, and Fields continued to state that he was going to put gas in his truck.  Id. at 4:30-4:45.  Temple told Fields to go outside the store to speak with the officers to avoid interfering with the business, and Fields walked toward the checkout counter.  Id. at 4:47-4:53.  Fields took off his jacket  and he removed some items that were clipped onto his pants, and he began to walk past the officers on his

---

[1]     There is no audio at the beginning of Temple's bodycam footage, and it is not possible to determine what Temple said to Fields while he was making a cup of coffee.

way out of the store. Id. at 4:55-5:01. Fields was fully out of the store and walking toward his truck when Comfort performed a takedown maneuver. Id. at 5:03-5:07. Comfort placed Fields in handcuffs and promptly allowed Fields to stand up, and Fields began to demand that the officers stop touching him. Id. at 5:43-6:03. The officers told Fields to calm down and they brought him to one of the patrol vehicles, and Fields sat in the back seat of a patrol car after continuing to argue with the officers. Id. at 6:05-7:57. Fields continued to argue with Comfort after he was placed in the patrol vehicle. Id. at 10:55-13:10. Fields was arrested on a misdemeanor charge of obstructing an officer, but the charge was dismissed before the case went to trial. Dkt. # 55-3, at 2; Dkt. # 72, at 13.

On October 16, 2020, Fields filed this case in Tulsa County District Court alleging claims under 42 U.S.C. § 1983 against the City, Temple, and Sallee for the use of excessive force to arrest plaintiff and for wrongful arrest. Fields' state court petition names Sallee and Temple as defendants as to his claims of excessive force and wrongful arrest, and he alleged a § 1983 claim against the City based on a theory of municipal liability. Defendants removed the case to this Court based on the presence of a federal question in Fields' petition. Fields filed an amended complaint (Dkt. # 21) clarifying that it was Comfort who allegedly use excessive force by performing a take down maneuver, and the use of excessive force claim (claim I) was alleged against Comfort only. Fields asserted a wrongful arrest claim (claim III) against Comfort, Temple, and Sallee, and a claim of municipal liability (claim II) against the City. Fields subsequently dismissed his claim against Sallee with prejudice to refiling. Dkt. # 74.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendants seek summary judgment on plaintiff's § 1983 claims.  Comfort argues that his use of a take down maneuver was objectively reasonable under the circumstances, and plaintiff cannot establish that his constitutional rights were violated by Comfort's conduct.  Dkt. # 57. Comfort and Temple argue that they had probable cause to arrest plaintiff for the offense of obstructing an officer in violation of OKLA. STAT. tit. 21, § 540.  Plaintiff disputes defendants' contention that he acted in a hostile manner toward police officers or that he refused to obey commands to speak to the officers.  Plaintiff claims that it was unnecessary for Comfort to use any amount of force to detain him, and he asserts that police officers lacked probable cause to arrest him for the offense of obstructing an officer.

### A.

Plaintiff argues that he was suspected of committing a non-violent misdemeanor and he was not resisting arrest, and he claims that any use of force by Comfort was unreasonable under the circumstances.  Dkt. # 72, at 22-25.  Comfort argues that he was investigating a possible domestic violence with a weapon charge and plaintiff was actively obstructing a police investigation, and the minimal use of force employed by Comfort to detain plaintiff was reasonable.  Dkt. # 57, at 14-16.

The Fourth Amendment governs claims concerning the use of force for a warrantless arrest before a probable cause hearing has been held.  Estate of Booker v. Gomez, 745 F.3d 405, 419 (10th Cir. 2014).  In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court set out the standards governing excessive force claims under the Fourth Amendment, and as a general matter explained that the reasonableness of the force used requires a "balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental

6

interests at stake." Id. at 396.  The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight," and not "every push or shove . . . violates the Fourth Amendment." Id.  The Court must consider factors such as the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Estate of Ceballos v. Husk, 919 F.3d 1204, 1213 (10th Cir. 2019).  The reasonableness inquiry is wholly objective and "an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ." McCoy v. Meyers, 887 F.3d 1034, 1045 (10th Cir. 2018).  The use of force may become unreasonable, even if the use of force is initially appropriate, if the person being detained is no longer a threat to the safety of police officers. Dixon v. Richer, 922 F.2d 1456, 1463 (10th Cir. 1991).

The first Graham factor is the severity of the crime at issue, and the parties dispute the nature of the underlying offense that police were investigating.  Comfort argues that plaintiff was suspected of a domestic violence offense involving a weapon, and he reasonably believed that plaintiff could be armed with a hammer. Dkt. # 57, at 15.  Plaintiff states that he was suspected of committing a "nonviolent misdemeanor," whether it was the domestic incident involving Warren or a possible obstruction offense. Dkt. # 72, at 23.  The evidence shows that Warren made a 911 call concerning plaintiff's conduct, and she told the 911 dispatcher that plaintiff had blocked her vehicle with his truck. Dkt. # 57-3, at 3.  She also claimed that plaintiff was banging on the window of her vehicle with a hammer and letting the air out of her tires. Id.  Warren subsequently clarified that Fields "tapped" on her window with the hammer, but at all times she maintained that she was afraid of Fields and she felt threatened by him.  Warren's statement at least provided police officers with

reasonable suspicion to warrant further investigation into a possible domestic violence with a weapon incident, and Fields' contention that police were investigating a "nonviolent misdemeanor" is not supported by the evidence.  The evidence also shows that officers developed additional evidence supporting a second possible crime of obstructing an officer based on Fields' conduct during their investigation.  When police officers made contact with plaintiff, he refused to comply with numerous requests to speak with the officers, and he became increasingly hostile towards Temple and Comfort as the encounter continued.  Plaintiff claims that he was "insulted" by the officers' requests to speak with him because "he knew that he had done nothing wrong," and he denies that he was hostile or agitated towards the officers. Dkt. # 72, at 7.  The Court must view the evidence from the perspective of a reasonable police officer at the scene, and plaintiff's refusal to comply with commands given by the officers and his demeanor could have suggested to a reasonable officer that plaintiff would use physical force against an officer.  The Court finds that nature of the underlying offenses supports the use of some force to detain plaintiff.

Plaintiff disputes that he posed any threat to police officers or that he was obstructing an investigation, and he claims that the second Graham factor (threat to officers) clearly supports his position that the use of any amount of force by Comfort was unreasonable.  Plaintiff claims that he posed no immediate threat to police officers when he was taken to the ground, and he asserts that he was clearly attempting to comply with Temple's request to exit the store. Dkt. # 72, at 23.  However, a reasonable police officer could have perceived plaintiff's actions as threatening and combative, even if the Court were to accept plaintiff's subjective belief that he did not intend to use physical force against the police officers.  Comfort argues that Fields was "walk[ing] aggressively" toward Comfort, and Comfort could have believed that Fields was armed with a hammer and attempting to

8

flee from the officers.  Dkt. # 57, at 15.  The Court will not rely on any party's characterization of the events and, instead, the Court has independently reviewed the video evidence to apply the Graham factors.  The video footage shows that plaintiff essentially ignored the police officers who were attempting to speak to him, and he refused to obey numerous commands to speak to the police officers outside the store.  Plaintiff became more hostile as the encounter continued and he directly told Comfort and Temple that he was going to ignore their commands and put gas in his car.  After putting some personal items on the counter inside the store, plaintiff again ignored a command to speak to the officers and he attempted to walk toward his car in direct violation of a command from Comfort.  The Court finds that plaintiff became increasingly agitated and hostile as the encounter continued and he made it clear that he would not obey any command issued by the officers on the scene.  Comfort took plaintiff to the ground and handcuffed him, and Comfort brought plaintiff to his feet as soon as the handcuffs were in place.  Plaintiff did not appear to suffer any injuries from the takedown and he did not make any statements suggesting that he was injured by Comfort's use of force.

The third Graham factor (flight risk) shows that the use of minimal force to detain plaintiff was reasonable under the circumstances.  Temple and Comfort had given plaintiff numerous commands to speak to them about Warren's allegations.   Plaintiff's conduct towards the officers was initially somewhat dismissive, but he became increasingly hostile as the encounter continued.  Although plaintiff made statements suggesting that he would speak to police officers after he put gas in his truck, plaintiff's conduct would have suggested to a reasonable police officer that he had no intention of complying with their commands and that he intended to flee from the scene.

Considering all of the <u>Graham</u> factors, the Court finds that Comfort's use of a take down maneuver to detain plaintiff was objectively reasonable under the circumstances.  Police officers were initially investigating a possible domestic violence with a weapon charge and, as the encounter with Fields developed, his increasingly hostile conduct provided support for an additional possible charge of obstructing an officer.  Plaintiff's behavior and demeanor, viewed from the perspective of a reasonable police officer, suggested that he could potentially use physical force against a police officer, and he plainly showed no intention of complying with the officers' commands to speak to them.  Comfort used a takedown maneuver as plaintiff was actively disobeying a command by Temple to stay and speak with the officers, and Comfort allowed plaintiff to quickly back to his feet after he was placed in handcuffs.  The use of force and the amount of force used was reasonable under the circumstances, and plaintiff has not shown that Comfort violated plaintiff's constitutional rights due to the excessive use of force.

**B.**

Defendants argue that police officers had probable cause to arrest plaintiff for the offense of obstructing an officer in violation of OKLA. STAT. tit. 21, § 540, based on plaintiff's failure to comply with repeated commands to speak with police officers about a potential domestic violence offense.  Dkt. # 55, at 9.  Plaintiff responds that police officers learned information contradicting Warren's initial statements made during the 911 call, and they had no basis to continue to investigate plaintiff for a possible domestic violence offense.  Dkt. # 72, at 18. Plaintiff also claims that he agreed to comply with Temple's request to speak to him after he pumped gas for which he had already paid, but Comfort prematurely used physical force to detain plaintiff before he could comply with the officer's commands.  <u>Id.</u> at 19.

The Fourth Amendment protects the "right of the people to be secure . . . against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV.  In the context of a false arrest claim, "an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause that the person had committed a crime." Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012). Probable cause exists when a police officer has sufficient information "to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964).  This is an objective standard and a court must consider the totality of the circumstances to determine whether a reasonable officer would have believed there was probable cause to make an arrest. Koch v. City of Del City, 660 F.3d 1228, 1239 (10th Cir. 2011). Probable cause "is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information." Cortez v. McCauley, 478 F.3d 1108, 1121 (10th Cir. 2007).  Once probable cause is established, a police officer is not required to search for exculpatory evidence before arresting a suspect.  Id.  A defendant is entitled to qualified immunity from a false arrest claim if there was "arguable probable cause" to make an arrest. Kaufman, 697 F.3d at 1300.  "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014).  "The proper inquiry in a § 1983 claim based on false arrest is not whether the person arrested actually committed an offense, but whether the arresting officer had probable cause to believe that he had." Crawford ex. rel. Crawford v. Kansas City, Kansas, 952 F. Supp. 1467, 1474 (D. Kan. 1997) (citing Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988)).

Under § 540, "[e]very person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his or her office" is guilty of a misdemeanor. There is no requirement that a person use physical force against a police officer in order to sustain a conviction under this statute. Marsh v. State, 761 P2d 915, 916 (Okla. Crim. App. 1988). "[W]ords alone may suffice to support a conviction for Obstructing an Officer." Trent v. State, 777 P.2d 401, 402 (Okla. Crim. App. 1989). The Tenth Circuit has found that a person's actions constituting potential flight or the failure to comply with an order to halt qualifies as a violation of § 540. United States v. Sanchez, 555 F.3d 910, 919 (10th Cir. 2009). Conduct that delays or impedes a police officer's investigation of a domestic violence offense can provide a sufficient basis for an arrest under § 540. Tucker v. City of Oklahoma City, 2013 WL 5303730 (W.D. Okla. Sep. 20, 2013).

The Court has independently viewed the video evidence and finds that police officers had probable cause to arrest plaintiff for the offense of obstructing an officer. The offense of obstructing an officer under Oklahoma law simply requires that a person delay or obstruct a public official in the performance of his or her duties, and plaintiff plainly delayed an ongoing investigation into a domestic violence incident by refusing to speak with Temple and Comfort. Even if plaintiff was not ultimately charged with a domestic violence offense, Warren's statements about Fields' conduct provided a sufficient basis for police to conduct an investigation about a possible domestic violence with a weapon charge. At a minimum, police officers had reasonable suspicion to briefly detain plaintiff while they investigated a possible domestic violence offense, and plaintiff's conduct during the officers' investigation gave rise to probable cause for plaintiff's arrest for obstructing an officer. Plaintiff's argument in opposition to summary judgment on this claim is essentially that he believed he was complying with the orders given by the police officers, and he disputes that police had

12

sufficient facts that would support any investigation into Warren's allegations concerning a possible domestic violence charge.  Dkt. # 73, at 13-15.  The Court must consider how a reasonable police officer would have viewed the facts and circumstances at the time plaintiff was arrested, and plaintiff's claims concerning his subjective beliefs or intentions during the encounter with police do not detract from the existence of probable cause in this case.  Comfort and Temple have established that they had probable cause to arrest plaintiff for the offense of obstructing an officer based on the objective evidence available to them when plaintiff was arrested.

Temple and Comfort also argue that they would be entitled to qualified immunity from this claim, even if plaintiff were able to show that facts developed after the incident called into question some of Warren's allegations concerning Fields' conduct.  The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity shields public officials from facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's claims.  Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1150 (10th Cir. 2006).  The Tenth Circuit applies a two-step analysis to determine if a defendant is entitled to qualified immunity.  A plaintiff must show that the defendant's actions violated a specific constitutional right and, if the plaintiff has shown that a constitutional violation occurred, the plaintiff must show that the constitutional right was clearly established when the conduct occurred.  Toevs. v. Reid, 685 F.3d 903, 909 (10th Cir. 2012).  Even if plaintiff could show that officers mistakenly relied on Warren's statements as a basis for an investigation into Fields' conduct, the Court would find that Temple and Comfort had arguable

probable cause to believe that plaintiff committed the offense of obstructing an officer. The officers had an objectively reasonable belief that they had sufficient facts to warrant an investigation into a possible domestic violence incident, even if Warren subsequently changed or clarified her allegations, and plaintiff committed the offense of obstructing an officer while they were engaged in this lawful investigation. Plaintiff's failure to comply with the officers' commands, not the validity of Warren's allegations, ultimately gave rise to his arrest for obstructing an officer, and Temple and Comfort have established that they had probable cause to arrest plaintiff for this charge. Plaintiff's failure to establish the existence of a constitutional violation would also support a finding that Temple and Comfort have qualified immunity from plaintiff's false arrest claim.

## C.

The City argues that plaintiff has not established that any violation of his constitutional rights occurred and plaintiff cannot proceed with a § 1983 claim against the City. Dkt. # 57, at 19. Under § 1983, a local government or municipality may be held liable for adopting an official policy or custom causing a violation of constitutional rights, but local governments can not be sued under a respondeat superior theory of liability. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978). "To establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." Moss v. Kopp, 559 F.3d 1155, 1168 (10th Cir. 2009). It is not enough for a plaintiff to allege that the actions of a governmental employee injured him. Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002). "Instead, it must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an

official with final policy making authority with respect to the challenged action." Seamons v. Snow, 206 F.2d 1021, 1029 (10th Cir. 2000). One way for a plaintiff to prove a claim of municipal liability is to show that an express policy deprived the plaintiff of a constitutional right. Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1279 (10th Cir. 2009). Another way to establish municipal liability is to show that an action taken by a final policymaker for the governmental entity violated or caused a violation of the plaintiff's constitutional rights. Simmons v. Uintah Health Care Special Dist., 506 F.3d 1281, 1285 (10th Cir. 2007).

The Court has determined that Comfort did not use excessive force when he detained plaintiff, and the Court has also found that police had probable cause to arrest plaintiff for obstructing an officer in violation of Oklahoma law. "The general rule in [Trigalet v. City of Tulsa, Oklahoma, 239 F.3d 1150 (10th Cir. 2001] is that there must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable" under § 1983. Crowson v. Washington County Utah, 983 F.3d 1166, 1191 (10th Cir. 2020). "If a plaintiff suffered no constitutional violation, he cannot recover simply because some municipal policy might have authorized an officer to violate the Constitution." Frey v. Town of Jackson, Wyoming, 41 F.4th 1223, 1239 (10th Cir. 2022). Even if the Court were to assume that plaintiff could identify an unconstitutional policy, he has not established that any person acting on behalf of the City violated his constitutional rights, and he cannot recover on a § 1983 claim against the City.

**IT IS THEREFORE ORDERED** that Defendant Officer Lucas Temple's Motion for Summary Judgment and Brief in Support (Dkt. # 55) and Defendant Officer Cherish Comfort's and City of Tulsa's Combined Motion for Summary Judgment and Brief in Support (Dkt. # 57) are **granted**. A separate judgment is entered herewith.

**DATED** this 7th day of December, 2022.

                                                      CLAIRE V. EAGAN
                                                      UNITED STATES DISTRICT JUDGE